1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACQLENE MARIE LOPEZ,<br><br>             Plaintiff,<br><br>       v.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY,<br><br>             Defendant. | Case No.  1:15-cv-01045-SAB<br><br>ORDER DENYING PLAINTIFF'S SOCIAL<br>SECURITY APPEAL<br><br>(ECF Nos. 17, 18, 19) |

## I.

## INTRODUCTION

Plaintiff Jacqlene Marie Lopez ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability benefits pursuant to the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff suffers from depressive disorder with psychotic features, personality disorder, benign pituitary tumor, headaches, substance abuse, and mild obstructive airway disease.  For the reasons set forth below, Plaintiff's Social Security appeal shall be denied.

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge.  (See ECF Nos. 9, 10.)

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff protectively filed a Title XVI application for supplemental security income on May 11, 2012.  (AR 94.)  Plaintiff's applications were initially denied on August 3, 2012, and denied upon reconsideration on February 11, 2013.  (AR 131-135, 138-142.)  Plaintiff requested and received a hearing before Administrative Law Judge Danny Pittman ("the ALJ").  Plaintiff appeared for a hearing on July 10, 2014.[2]  (AR 41-83.)  On August 22, 2014, the ALJ found that Plaintiff was not disabled.  (AR 14-27.)  The Appeals Council denied Plaintiff's request for review on May 14, 2015.  (AR 1-3.)

### A.    Relevant Hearing Testimony

Plaintiff testified at the July 10, 2014 hearing.  (AR 45-70.)  Plaintiff was born on January 10, 1993.  (AR 45.)  Plaintiff is 5 feet tall and weighs 125 pounds.  (AR 45.)  Plaintiff is right-handed.  (AR 45.)  Plaintiff is single, lives with her parents, and has no children.  (AR 45-46.)  Plaintiff has no income and does not receive any public assistance.  (AR 47.)  Plaintiff has a driver's license and drives a few days out of the week.  (AR 47.)

Plaintiff went on home studies due to her disabilities and graduated from high school.  (AR 47.)  Plaintiff received tutoring in history and math.  (AR 48.)  Plaintiff is able to read and write.  (AR 48.)  Plaintiff worked for one month at a water park but was let go because she had episodes that required an ambulance to be called.  (AR 48-49.)

When Plaintiff is surrounded by people, she gets anxious and begins to hear voices in her head.  (AR 50.)  Plaintiff has started the process of applying for jobs but stopped due to the voices in her head telling her to hurt herself or hurt someone else.  (AR 50.)  Plaintiff is unable to work because of her mental issues.  (AR 50.)

Plaintiff sees a psychiatrist and a therapist.  (AR 50.)  The therapist has helped somewhat but the psychiatrist is still trying to find the right medication to address Plaintiff's symptoms of visual and auditory hallucinations and paranoia.  (AR 50-51.)  Plaintiff takes her medication as

---

[2] This hearing was continued from July 10, 2014 due to Plaintiff's request for a psychiatric consultative examination. (AR 31-40.)

prescribed.  (AR 52.)  The medications help her sleep, and help her depression somewhat, but not much with the auditory hallucinations.  (AR 52.)  Plaintiff also takes medication that helps her headaches.  (AR 52.)  Plaintiff's medications cause her to gain weight and make her very tired. (AR 52.)

Plaintiff was hospitalized when she was seventeen for mental health issues because she was about to kill herself.  (AR 52-53.)  Plaintiff was not using marijuana at that time.  (AR 53.) Plaintiff last used marijuana about a month prior to the hearing.  (AR 53.)  Plaintiff has been told that the marijuana can make her symptoms worse.  (AR 53.)  Plaintiff uses marijuana occasionally to help her relax even though she knows that she is not allowed to use it.  (AR 54.) Plaintiff smokes cigarettes.  (AR 54.)

Plaintiff attended City College in 2011.  (AR 54.)  Plaintiff registered for classes but did not go because she was having panic attacks the first week of school.  (AR 55.)  She went back in 2012 and finished the semester.  (AR 55.)  She took the majority of her classes online and received mostly Cs.  (AR 55.)  Plaintiff is still attending classes at City College.  (AR 55.) Plaintiff attends mostly online, but does have face to face classes and is in a program for disabled students.  (AR 55.)  She is allowed extra time on tests and can use a tape recorder because she gets distracted by the voices and cannot hear the teacher.  (AR 55-56.)  Plaintiff has failed some classes and dropped others that were too hard for her.  (AR 57.)  Even when Plaintiff does not have hallucinations, she still has anxiety so that is why it is taking her so long to go through school.  (AR 66.)

Plaintiff has trouble with her memory and is very forgetful due to her medications.  (AR 56.)  Plaintiff has problems concentrating because she is anxious and either sees things that distract her or hears things.  (AR 56.)  Before she got sick, Plaintiff had a good memory, was able to focus, and got good grades.  (AR 66.)  Plaintiff's hallucinations are mostly auditory.  (AR 58.)  She generally has auditory hallucinations every day, but in a good week will have hallucinations every other day.  (AR 65.)  She has visual hallucinations but they have improved with the medication.  (AR 58.)  Plaintiff has anxiety attacks three to four times per week which are normally brought on by a stressful situation.  (AR 64.)  Plaintiff gets short of breath and the

1   voices in her head get louder almost to the point of screaming or they will tell her to hurt herself

2   or other people.  (AR 64.)  The voices told her to kill a dog and she tried to drown it and the

3   police were called.  (AR 64.)  The anxiety attacks last from 20 to 30 minutes or for hours.  (AR

4   64.)

5           Plaintiff does not think that she could follow simple instructions that were given to her.

6   (AR 57.)  She barely gets passing grades because she is given extra special privileges.  (AR 57.)

7   Plaintiff does not have problems making decisions.  (AR 57.)  She has problems getting along

8   with people.  (AR 57.)  She has gotten violent or upset over small things, even trying to break her

9   mother's wrist.  (AR 58.)  Plaintiff has tried killing or hurting herself more than a dozen times.

10  (AR 67.)  She used to cut herself a lot.  (AR 67.)  Plaintiff will wake up in the morning with cuts

11  on herself and does not know how they got there.  (AR 67.)  Plaintiff has episodes where she is

12  no longer herself and she gets very violent.  (AR 67.)  These happen once to twice a week.  (AR

13  68.)  About two months ago, the voices told Plaintiff to hurt herself so she jumped out of the car

14  on the freeway.  (AR 70.)

15          Plaintiff spends some of her day with classes but does not have much school work.  (AR

16  59.)  She spends her time with her parents or writing because it helps her anxiety.  (AR 59.)

17  Plaintiff does not do much because she is majorly depressed.  (AR 59.)  Plaintiff has difficulty

18  falling asleep and wakes up a lot during the night.  (AR 59.)  Plaintiff sleeps about seven hours a

19  night and does not nap during the day.  (AR 59.)

20          Plaintiff is able to take care of her own self-care.  (AR 59.)  Plaintiff does not do any

21  housework or cooking or yardwork.  (AR 60.)  They have a housekeeper and gardener.  (AR 60.)

22  All Plaintiff does around the house is collect the cloths from the laundry so her mom can wash it.

23  (AR 60.)  Plaintiff is able to maintain her own bank account with her mother's help.  (AR 61.)

24  Plaintiff goes to church when her mother forces her to.  (AR 61.)  Plaintiff has to leave church

25  when she goes because there are a lot of pictures and she sees blood coming down them which

26  gives her panic attacks.  (AR 61-62.)

27          Plaintiff has no friends.  (AR 62.)  Plaintiff goes to the movies once or twice a month and

28  goes out to restaurants.  (AR 62.)  Plaintiff goes to the movies with her parents or her boyfriend.

1  (AR 63.)  Plaintiff does not go to sporting events or the mall because there are too many people.

2  (AR 62-63.)  Plaintiff likes to write in her journal.  (AR 63.)

3        Plaintiff's father, David Lopez, also testified at the hearing.  (AR 71-78.)  Mr. Lopez

4  lives with Plaintiff.  (AR 71.)  Plaintiff's medical conditions have been going on for five years.

5  (AR 71.)  Her initial diagnosis was for severe depression.  (AR 71.)  It devolved into suicidal

6  ideation, cutting, and hearing voices.  (AR 71.)  Plaintiff has been to numerous doctors and had

7  different types of testing to determine if her mental condition is organic or not.  (AR 72.)  The

8  doctors found a benign tumor in her brain.  (AR 72.)  They said it was not significant enough to

9  be causing her symptoms.  (AR 72.)

10       Plaintiff hears voices consistently day and night.  (AR 72.)  Plaintiff wakes up fighting

11  with the voices.  (AR 72.)  Any stressor can trigger an episode.  (AR 72.)  It can be going to

12  school, a public gathering, or even something as benign as a family event.  (AR 73.)  Something

13  very simple can set her off and she loses control.  (AR 73.)  She becomes verbally abusive, with

14  profanity.  (AR 73.)  She can get physically abusive; and they have had to call the police on at

15  least three occasions.  (AR 73.)  On one occasion, Plaintiff was 5150 due to suicide attempts.

16  (AR 73.)  She will be verbally threatening.  (AR 73-74.)  The next day she does not remember

17  the incidents.  (AR 74.)  She tried to drown her boyfriend's dog because she was told to by the

18  voices.  (AR 74.)

19       When Plaintiff is on medication and stabilized with no stressors, even at a public event,

20  she will be similar to everyone in the room.  (AR 74.)  Plaintiff is above the highest dose of off-

21  label schizophrenic medication because the doctors believe that is what she needs to reduce the

22  episodes of psychotic events.  (AR 74.)  Plaintiff hears voices all the time.  (AR 77.)

23       Plaintiff tried to work after high school at the water park but she passed out and they

24  called the ambulance three times.  (AR 78.)  She cannot work outside because of her medication.

25  (AR 78.)  She interviewed for the Girl Scouts but the voices told her to hurt the children, so she

26  said she could not work there.  (AR 78.)

27       A vocational expert ("VE") Stephen B. Schmidt also testified at the hearing.  (AR 80-81.)

28  / / /

**B.      ALJ Findings**

The ALJ made the following findings of fact and conclusions of law:

- Plaintiff has not engaged in substantial gainful activity since the application date of May 11, 2012.
- Plaintiff has a severe impairment of depressive disorder with psychotic features.
- Plaintiff does not have an impairment or combination of impairments the meet or medically equal the severity of one of the listed impairments.
- Plaintiff has the residual functional capacity to perform a full range of work at all exertional levels.  Plaintiff can perform simple, routine tasks with limited public contact and limited coworker interaction.
- Plaintiff has no past relevant work.
- Plaintiff was born on January 10, 1993, and was 19 years old on the date the application was filed, which is defined as a younger individual.
- Plaintiff has at least a high school education and is able to communicate in English.
- Transferability of job skill is not an issue as Plaintiff has no past relevant work.
- Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.
- Plaintiff has not been under a period of disability as defined in the Social Security Act since the date the application was filed of May 11, 2012.

(AR 19-27.)

## III.

## LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

6

months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520; Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm

1  simply by isolating a specific quantum of supporting evidence."  Hill, 698 F.3d at 1159 (quoting

2  Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006).  However, it is not

3  this Court's function to second guess the ALJ's conclusions and substitute the court's judgment

4  for the ALJ's.  See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is

5  susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be

6  upheld.").

7                                                 **IV.**

8                               **DISCUSSION AND ANALYSIS**

9        Plaintiff raises two issues: whether the ALJ adequately considered the severity of

10  Plaintiff's personality disorder and whether the ALJ properly rejected the opinion of Plaintiff's

11  treating physician.  Defendant argues that the ALJ properly relied on the opinion of Dr. Michiel

12  who opined that despite a depressive disorder with psychotic features Plaintiff would be able to

13  perform simple repetitive tasks and interact with others.

14        **A.    The ALJ Did Not Err by Failing to Separately Address Plaintiff's Personality
15               Disorder**

16        Under the Social Security Act, disability is defined as the "inability to engage in any

17  substantial gainful activity by reason of any medically determinable physical or mental

18  impairment which can be expected to result in death or which has lasted or can be expected to

19  last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The burden

20  is on the claimant to prove that she is disabled at steps one through four, at step five the burden

21  shifts to the Commissioner to show that there are a significant number of jobs in the national

22  community that the claimant can perform.  Bray v. Commissioner of Social Security Admin.,

23  554 F.3d 1219, 1222 (9th Cir. 2009).

24        As described above, at step two the ALJ is to consider the medical severity of the

25  impairments to determine if they meet the durational requirements under the Act.  20 C.F.R. §

26  404.1520(a)(4)(ii).  A severe impairment is an impairment or combination of impairments that

27  significantly limits the claimant's physical or mental ability to do basic work activities.  20

28  C.F.R. § 404.152(c).  Basic work activities are the abilities and aptitudes necessary to do most

jobs.  20 C.F.R. §404.1521(b).  "An impairment is not severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.' "  Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005) (quoting S.S.R. No. 96–3(p) (1996)).

Here, the ALJ considered that Plaintiff had been diagnosed with psychosis; self-injurious behavior; marijuana exposure; auditory and visual hallucinations; migraine headaches; a history of cutting; depression; suicidal ideation; schizoaffective disorder; unspecified psychosis; major depressive affective disorder, recurrent episode, severe, specified as with psychotic behavior; schizophrenia, undifferentiated type; relational problems, not otherwise specified; histrionic personality disorder; and depressive disorder with psychotic features.  (AR 22-23.)  The ALJ identified Plaintiff's severe mental impairment as depressive disorder with psychotic features. (AR 19.)

Plaintiff argues that four doctors diagnosed Plaintiff with a personality disorder and the ALJ only made a single reference to Dr. Radellant's opinion without addressing the opinions of Dr. Sievert or the agency physicians.  However, Plaintiff does not point to any functional limitations in the record due to the diagnosis of a personality disorder.  "The mere existence of an impairment is insufficient proof of a disability" because the "claimant bears the burden of proving that an impairment is disabling."  Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993). In this instance, the ALJ considered the opinion of Dr. Radellant who diagnosed Plaintiff with histrionic personality disorder.  (AR 449.)  Dr. Radellant found that:

> In terms of assessment of her thoughts and feelings regarding interpersonal relationships by means of the Thematic Apperception Test, Ms. Lopez seems to have a very dark imagination.  The feelings, thoughts and themes depicted in her stories reveal ideation regarding death and negative circumstances that are not characteristic of most people.  The consistently dark themes that are reflected in terms of her stories regarding the drawings depicted in the TAT test material provide evidence that Ms. Lopez may have a histrionic aspect within her personality configuration.  She dramatizes circumstances of her life, herself and others, and she does so in a way that is extremely dark and distorted compared to normative material that might be expected from an average individual taking these tests.
>
> This is consistent with the negative ideation that invalidated her performance on the MMPI and the Million.  It substantiates and may validate the hypothesis that Ms. Lopez has a histrionic response style, and she tends to view relational

1  material in a significantly negative light.

2  (AR 448-449.)  Dr. Radellant recommended that Plaintiff maintain frequent contact with her

3  treating psychiatrist and take antipsychotic medication consistently, attend individual and group

4  psychotherapy, and participate in relational activity with her family and peers.  (AR 449.)

5  The ALJ considered that Plaintiff complains of panic attacks which are triggered by

6  stress and depression, but she has demonstrated an ability to attend regular classes on campus.

7  (AR 25.)  While Plaintiff alleges that she isolates herself from others, she has a boyfriend that

8  she sees regularly.  (AR 25.)  Considering Plaintiff's ability to interact with others, the ALJ

9  found that Plaintiff could have limited public contact and limited coworker interaction.  (AR 21.)

10  This determination is not inconsistent with Dr. Radellant's opinion which indicates that Plaintiff

11  is able to participate in relational activities with her family and peers.  Further, this is consistent

12  Dr. Sievert's opinion that Plaintiff is able to interact with other people on a simple basis but is

13  unable to interact over an extended period of time or of any complicated nature (AR 457), and

14  more limited than Dr. Michiel's opinion that Plaintiff is able to relate and interact with

15  coworkers, supervisors and the general public (AR 455).  The ALJ considered the record as a

16  whole in determining Plaintiffs' mental residual functional capacity.

17  The ALJ did not err by failing to specifically address Plaintiff's diagnosis of personality

18  disorder.

19  **B.    Dr. Sievert's Opinion**

20  Plaintiff argues that the ALJ erred by rejecting the opinion of Plaintiff's treating

21  physician, Dr. Sievert, that Plaintiff was unable to pursue any consistent occupational efforts

22  currently or in the future and that she was permanently disabled.  Defendant counters that the

23  ALJ relied on specific and legitimate evidence in the record that supports the finding that

24  Plaintiff is not disabled.  Plaintiff replies that the ALJ should have given controlling weight to

25  Dr. Sievert's opinion that Plaintiff was unable to perform even simple and routine work.

26  The weight to be given to medical opinions depends upon whether the opinion is

27  proffered by a treating, examining, or non-examining professional.  See Lester v. Chater, 81 F.3d

28  821, 830-831 (9th Cir. 1995).  In general a treating physician's opinion is entitled to greater

weight than that of a nontreating physician because "he is employed to cure and has a greater opportunity to know and observe the patient as an individual." Andrews v. Shalala, 53 F.3d 1035, 1040-41 (9th Cir. 1995) (citations omitted).   If a treating physician's opinion is contradicted by another doctor, it may be rejected only for "specific and legitimate reasons" supported by substantial evidence in the record. Ryan v. Commissioner of Social Sec., 528 F.3d 1194, 1198 (9th Cir.) (quoting Bayless v. Barnhart, 427 F.3d 1121, 1216 (9th Cir. 2005)).

Where the treating physician's opinion is contradicted by the opinion of an examining physician who based the opinion upon independent clinical findings that differ from those of the treating physician, the nontreating source itself may be substance evidence, and the ALJ is to resolve the conflict. Andrews, 53 F.3d at 1041.  However, if the nontreating physician's opinion is based upon clinical findings considered by the treating physician, the ALJ must give specific and legitimate reasons for rejecting the treating physician's opinion that are based on substantial evidence in the record. Id.

The contrary opinion of a non-examining expert is not sufficient by itself to constitute a specific, legitimate reason for rejecting a treating or examining physician's opinion, however, "it may constitute substantial evidence when it is consistent with other independent evidence in the record." Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).  The ALJ need not accept the opinion of any physician that is brief, conclusory, and unsupported by clinical findings. Thomas, 278 F.3d at 957.

While the ALJ must consider the treating physician's opinion, it "is not necessarily conclusive as to either physical condition or the ultimate issue of disability." Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).  The ALJ is not bound by the treating physician's opinion on disability, but cannot reject the opinion without presenting legally sufficient reasons to do so. Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998)

Dr. Sievert provided two letters regarding Plaintiff's disability.  The first letter is dated January 27, 2014, and states:

> I have seen Ms. Jacqlene Lopez for psychiatric care since September 2, 2011.  I am treating her with the diagnosis of schizoaffective disorder which has been very resistant to treatment.  She has taken many medications and is currently taking

Seroquel XR 950 mg a day and Zoloft 150 mg a day. She has through the time that I have seen her taken many other medications. None of them have been entirely effective and she continues to experience hallucinations and mood fluctuations. She has suspicious [sic] of other people, even strangers. She finds it difficult to function outside of her home because of suspicions she has that other people are unusually interested in her. . . . I believe Ms. Lopez is totally and permanently disabled by her mental illness and even though she complies with treatment recommendations she is not able to pursue active employment.

(AR 436.)

On July 9, 2014, Dr. Sievert wrote a second letter.

As you know I have been treating Jacqlene Lopez, date of birth 1/10/1993 for several years. She is not able to function in any vocational effort, even if of simple and repetitive in nature. She is totally and permanently disabled from any vocational endeavors and it does not matter if they are simple and repetitive. She is able to interact on a simple basis with other people but would not be able to cover extended periods of time or of any complicated nature. I do not see her as able to pursue any consistent occupational efforts now or in the future.

(AR 457.)

In this instance, the ALJ noted that Dr. Siebert's treatment notes showed that Plaintiff saw him monthly and reflected her subjective complaints. (AR 22.) Although the ALJ considered Dr. Sievert's diagnosis, he gave limited weight to Dr. Sievert's opinion because whether Plaintiff is disabled is an issue reserved for the Commissioner and his opinion regarding Plaintiff's disability is undermined by her apparent malingering during psychological testing. (AR 24.) An ALJ can reject a physician's opinion that is premised on a claimant's subjective complaints that have been properly discounted. Fair v. Bowen, 885 F.2d 597, 605 (1989).

While Plaintiff argues that the failure to consider Plaintiff's personality disorder was error because it affected the analysis of Dr. Sievert's opinion regarding Plaintiff's functional limitations, whether or not inconsistent information is the result of a conscious intention to mislead is immaterial. Dr. Radellant found that the multiphasic personality inventory performance leads "one to suspect that [Plaintiff] might be malingering or faking negative attitude about her life and her problems in order to substantiate her needs for help. Nevertheless, this does not mean that she is not suffering or in need of help." (AR 444.) Dr. Radellant also found that performance on the Million also indicated that Plaintiff "professed greater subjective distress that would otherwise be the case, even from one suffering from severe psychopathology.

1   Given this, there exist indications that she may be malingering.  Even as a schizophrenic or a

2   seriously psychotic individual, Ms. Lopez response style would be relatively unlikely."  (AR

3   444-445.)  The exaggeration of symptoms even without the intention to mislead substantiates

4   that the information Plaintiff provided is unreliable.  See Olivas v. Colvin, No. 12-10320 SS,

5   2013 WL 5728214, *10 (C.D. Cal. Oct. 22, 2013) (unpublished).

6        The ALJ gave significant weight to the opinion of Dr. Michiel who concluded that

7   Plaintiff was able to perform simple repetitive tasks and was able to interact with supervisors,

8   coworkers, and the public because it was based on a thorough, well-documented examination.

9   (AR 24.)  Dr. Michiel performed a psychiatric evaluation on March 28, 2014 and found that

10  Plaintiff's speech was normal in process, although there were interrupted by periods of halting

11  and open crying.  (AR 454.)  Plaintiff denied suicidal or homicidal ideations.  (AR 454.)

12  Plaintiff's thought process was goal-directed; and thought content was not delusional.  (AR 454.)

13  Dr. Michiel noted no hallucination and illusion during the interview, although Plaintiff admitted

14  to auditory and visual hallucinations and paranoid feelings.  (AR 454.)  Plaintiff was oriented to

15  person, place and time.  (AR 454.)  Attention, concentration, and immediate recall were normal.

16  (AR 454.)  Remote memory did not show any impairment.  (AR 454.)  Judgment was intact,

17  abstract thinking was not concrete.  (AR 454.)  Fund of knowledge was below average.  (AR

18  454.)  Dr. Michiel diagnosed Plaintiff with depressive disorder with psychotic features; benign

19  pituitary tumor, and bronchial asthma, GAF 55.  (AR 454-455.)

20       Dr. Michiel opined that Plaintiff was able to maintain attention and concentration to carry

21  out simple repetitive job instructions; can relate and interact with coworkers, supervisors and the

22  general public while performing simple repetitive job instructions; but would be unable to carry

23  out an extensive variety of technical and/or complex instructions.  (AR 455.)  Plaintiff had no

24  restrictions on activities of daily living.  (AR 455.)  Dr. Michiel's opinion is substantial evidence

25  to support the ALJ's determination that Plaintiff is able to perform simple and routine tasks.

26       The ALJ gave significant weight to the opinion of Dr. Murillo, the agency physician who

27  reviewed the medical record and found Plaintiff was able to perform simple repetitive tasks

28  because it was consistent with the opinion of Dr. Michiel.  (AR 24.)  On February 8, 2013, Dr.

1    Murillo diagnosed Plaintiff with affective disorder and personality disorder. (AR 112.) He

2    found that Plaintiff had no restrictions of activities of daily living; mild difficulties in

3    maintaining social functioning; mild difficulties in maintaining concentration, persistence or

4    pace; and no repeated episodes of decompensation, each of extended duration. (AR 113.) Dr.

5    Murillo found that Plaintiff was doing well with treatment. (AR 112.) Plaintiff's mental health

6    conditions were responding well to aggressive medication management and therapy. (AR 113.)

7    He opined that Plaintiff retained the "capacity to predictably sustain srt." (AR 113.)

8        Dr. Balson, an agency physician had diagnosed Plaintiff with affective disorders and

9    personality disorders on August 2, 2012. (AR 88-89.) Dr. Balson also found that Plaintiff had

10   no restrictions of activities of daily living; mild difficulties in maintaining social functioning;

11   mild difficulties in maintaining concentration, persistence or pace; and no repeated episodes of

12   decompensation, each of extended duration. (AR 89.) Dr. Balson found that Plaintiff's mental

13   health impairments were both responding well to aggressive medication management and

14   therapy. (AR 89.) Dr. Balson found that Plaintiff retained the "capacity to attain/sustain open

15   market srt within a workplace which does not demand intensive/extensive interaction with public

16   and peers. (AR 92.)

17       Both agency physicians noted that Plaintiffs most recent Global Assessment of Function

18   ("GAF") Scores[3] were 70 which suggest that Plaintiff retains the capacity to work. Review of

19   Dr. Sievert's records shows that Plaintiff was consistent found to have a GAF between 65-70 or

20   higher (AR 368, 369, 370, 371, 372, 373, 403, 404, 405, 427, 428, 429, 430, 431, 432, 433, 434),

21   which had improved from a GAF of 60 (AR 374, 375, 376, 377, 379.) While as Plaintiff argues

22

23   [3] "A Global Assessment of Functioning ("GAF") score is the clinician's judgment of the individual's overall level of
     functioning. It is rated with respect only to psychological, social, and occupational functioning, without regard to

24   impairments in functioning due to physical or environmental limitations." Cornelison v. Astrue, 2011 WL 6001698,
     at *4 n.6 (C.D. Cal. Nov. 30, 2011) (citing American Psychiatric Association, Diagnostic and Statistical Manual of
     Mental Disorders, at 32 (4th ed.2000)). "A GAF score in the range of 51–60 indicates moderate symptoms or

25   moderate difficulty in social, occupational, or school functioning ( e.g., few friends, conflicts with peers or
     coworkers)." Cornelison, 2011 WL 6001698, at 4 n.6 (citing American Psychiatric Association, Diagnostic and

26   Statistical Manual of Mental Disorders ("DSM–IV"), at 34). "A GAF score between 61–70 indicates '[s]ome mild
     symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school

27   functioning ... but generally functioning pretty well, has some meaningful interpersonal relationships.' " Atkinson v.
     Astrue, No. 2:10-CV-02072-KJN, 2011 WL 4085414, at *10 (E.D. Cal. Sept. 13, 2011) (quoting American

28   Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed.)).

the GAF scores are only a snapshot of the record, the medical record in this instance supports the agency physician's findings that Plaintiff was responding well to her medication regime and therapy and had only mild symptoms, especially in light of the lack of any objective findings in Dr. Siebert's records.

The opinions of the agency physicians, which are consistent with Dr. Michiel's examination, the lack of objective findings and the GAF scores reflected in the treatment records are substantial evidence to support the ALJ's findings. Tonapetyan, 242 F.3d at 1149.

The Court finds that the ALJ provided specific and legitimate reasons to reject the opinion of Dr. Sievert that are supported by substantial evidence in the record. Ryan, 528 F.3d at 1198.

## V.

### CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ did not err by failing to separately address Plaintiff's personality disorder or in rejecting the opinion of her treating physician. Accordingly,

IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the Commissioner of Social Security is DENIED. It is FURTHER ORDERED that judgment be entered in favor of Defendant Commissioner of Social Security and against Plaintiff Jacqlene Lopez. The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.

Dated: __**June 29, 2016**__

_____
UNITED STATES MAGISTRATE JUDGE